MIZNER LAND CORPORATION, et al., v. CHARLES D. ABBOTT, et al.

MIZNER LAND CORPORATION, a Corporation, et al., v. L. S. GAULDEN, et al.

175 So. 507.
Opinion Filed March 12, 1937.
Rehearing Granted April 9, 1932.
On Rehearing June 28, 1937.

490

On Rehearing, June 28, 1937.

W. H. *Mizell* and *Daniel & Thompson,* for Appellants; *Milam, McIlvaine & Milam,* for Appellees.

TERRELL, J.—Several years prior to 1928, Victor A. Searles, an elderly gentleman from New Jersey, an obscure artist and draftsman by profession and without business inclination or experience, inherited an estate valued at several million dollars. He soon after went to Palm Beach, purchased a handsome ocean front home, and contacted some real estate men who sold him 4916.93 feet of unimproved ocean front lands near the town of Boynton, which we hereinafter designate as Mizner mile.

He then organized the Mizner Land Corporation, took one-third the stock in his own name, conveyed one-third to Port Quinn, his real estate agent, and one-third to Addison Mizner, an architect. He conveyed Mizner mile in fee to Mizner Land Corporation without any consideration from Quinn and Mizner for their stock in the corporation or interest in Mizner mile except their promise to develop and sell it.

In addition to his inheritance, Searles arrived in Palm Beach with a young wife who had an affinity for the species *homo sapiens*. She gave him a bag of trouble and along with that he became dissatisfied with the bargain he made with Quinn and Mizner. In this dilemma he employed the law firm of Abbott and Gaulden of West Palm Beach to recover the interest in Mizner mile he had conveyed Quinn and Mizner, to litigate his domestic affairs, and agreed to pay them a fee of $50,000.00.

Abbott and Gaulden first organized East Inlet Development Corporation for Searles and on their advice he (Searles) as president of Mizner Land Corporation, deeded Mizner mile to the new corporation. Suits were then instituted in behalf of Searles against Quinn and Mizner to recover the stock held by them in Mizner Land Corporation and they in turn instituted counter suits against Searles for services, et cetera.

After some months litigating, a compromise was reached whereby Searles agreed to pay Quinn and Mizner $100,-000.00, for their stock in Mizner Land Corporation, give Quinn exclusive right to sell Mizner mile, and pay him ten per cent of the selling price as a commission when sale was effected. Searles also agreed to have Mizner Land Corporation convey Mizner mile in fee to Abbott as trustee with full power to sell and convey and to pay him (Abbott) ten per cent of the sales price for his services as trustee.

In the latter part of 1928, Searles, having acquired four corporations besides other matters in which he was deeply involved, made a contract with Abbott to give up the general practise of law and devote all his time to his (Searles) business as his personal counsel. The latter contract provided for compensation equal to what Abbott had been making in the practise which was agreed to be over $40,-000.00 per year. In September, 1930, when the latter con-

tract had been in effect for nearly three years without any payment thereon, Abbott found a purchaser for Mizner mile at a price of $650,000.00 and advised Searles that if sold for that amount he would insist on payment of his trustee's fee and two years' compensation on his contract as attorney. Searles insisted that he could not spare that amount from the sales price and suggested that Abbott reduce the amount due him. Negotiations between them resulted in a new contract fixing Abbott's total compensation for all services due him by Searles to date at $135,-000.00. The Mizner mile was sold in October, 1930, at the price stated and Abbott was paid the full amount due him under the latter contract from the proceeds of the sale.

June 11, 1930, Abbott and Gaulden entered into a written agreement dissolving their law partnership and on September 5, following, Gaulden as plaintiff filed chancery suit No. 9000 against Abbott individually and as trustee for Mizner Land Corporation, Mizner Land Corporation, a corporation, West Palm Beach Atlantic National Bank, and Victor A. Searles, the bill alleging the facts set out herein with others, and prayed that a specific fund of $18,850.00 on deposit in West Palm Beach Atlantic National Bank to the credit of Abbott's wife, be impounded and that an equitable assignment or lien be impressed thereon in favor of Gaulden, whose claim on said fund was based on the partnership dissolution agreement with Abbott.

On May 1, 1931, Mizner Land Corporation, Mavic Corporation, Charlotte Corporation, East Inlet Corporation, and Victor A. Searles, filed equity suit No. 9367 against C. D. Abbott and wife, Josephine Abbott, L. S. Gaulden, West Palm Beach Atlantic National Bank, and Atlantic Title Company, praying for an accounting and recovery from Abbott and Gaulden in behalf of Searles of large sums of money entrusted to them, to impound a part of said fund of

$18,850.00 on deposit in West Palm Beach Atlantic National Bank, and to enforce payment of all the balance of said funds found to be due Searles. The bill of complaint is predicated on the theory that Searles trusted Abbott and Gaulden as his counsel and that they deceived, defrauded, and overreached him.

Answers were filed, the issues were made in both suits (No. 9000 and No. 9367), and on motion of Abbott the chancellor entered an order consolidating them. Manley P. Caldwell was appointed Special Master to take testimony and report findings as to whether complainants in suit No. 9367 were entitled to the accounting prayed for. The Special Master, after taking testimony, found that a fiduciary relationship of the highest type existed between complainants and defendants in suit No. 9367, and that complainants had entrusted large sums of money to Abbott and Gaulden prior to the dissolution of their partnership and to Abbott thereafter for which they had failed to account. He recommended that they be required to account for said funds and further found that it was not material that some of them were paid to Abbott alone prior to dissolution of the firm or to Abbott otherwise as trustee, since the relationship of attorney and client existed at all times between complainants and defendants, and that such trust was in pursuance of that relationship.

The Master's report was excepted to by Abbott and Gaulden severally, their exceptions were overruled, and the report was confirmed by the chancellor. The cause was then re-referred to the Special Master to hear testimony and state an account between the parties. Abbott and Gaulden filed their statement of accounts with the Master who required them to be substituted with fuller and more complete accounts. On motion of appellees, the chancellor entered an order relieving Special Master Cald-

well, but at the same time ordering that all testimony taken by him be committed to and made part of the files. Hon. Bayard B. Shields was appointed Special Master with instructions to take testimony, state an account between the parties, and report his findings of law and fact.

Special Master Shields took testimony and found that the contract between Abbott and Searles for the payment of the fee of $135,000.00 was void because the minds of the parties did not meet. He also found that Abbott did not waive his rights under the agreement of May 31, 1929, whereby Searles agreed to pay him a trustee's fee of ten per cent of the sales price of Mizner mile when sold. The Master's report stated the following accounts between the parties: (1) That prior to May 1, 1929, Searles paid Abbott and Gaulden $6,000.00 of which $5,000.00 was on account of a $50,000.00 fee, $500 for traveling expenses, and $500 for small fees and expenses. (2) That between May 22, 1929, and December 1, 1929, Searles entrusted Abbott and Gaulden through Abbott with a total of $100,476.13, he allowed proper disbursements of $91,476.13, and found that Abbott and Gaulden were both indebted to Searles for the balance of $9,000.00. (3) That on April 8, 1930, Mavic Corporation entrusted to Abbott $65,000.00, he allowed proper disbursements therefrom of $47,760.90, and found that Abbott was indebted to Mavic Corporation for the balance of $17,239.10. He found that Gaulden was not responsible with Abbott for this fund because though received by Abbott two months before the partnership of Abbott and Gaulden was actually dissolved, it was at least six months after Gaulden had been precluded by Searles from handling any funds placed with Abbott. (4) That on June 5, 1930, $50,000.00 was deposited in the bank to the joint account of Abbott and Searles. He allowed $33,789.76 disbursement to Abbott from said account and found $16,210.24 of it to

be unaccounted for but found that the latter balance was withdrawn by joint checks of Abbott and Searles, that nothing was shown whereby Abbott could be fairly charged with receiving it, and that it would not be charged against Gaulden. (5) That out of the proceeds of the $650,000 sale of Mizner mile all but $73,291.02 was properly disbursed, which last named amount he found Abbott indebted to Mizner Land Corporation for, no part of which could be charged to Gaulden because received by Abbott long after the dissolution of the partnership. (6) That on December 19, 1930, Abbott was indebted to Searles for an unpaid loan of $5,000.00. (7) That Gaulden was indebted to Abbott in the sum of $471.66 for law books listed in the partnership dissolution agreement which Gaulden assumed responsibility for but which Abbott was required to pay.

The Master also found that Gaulden's right to the fund of $18,850.00 impounded in the West Palm Beach Atlantic National Bank was superior to that of Mizner Land Corporation by reason of the terms of the partnership dissolution agreement wherein Abbott agreed to pay Gaulden twenty-nine per cent of his (Abbott's) trustee's fee for selling Mizner mile, and that said agreement created an equitable lien on said fund in favor of Gaulden of which Searles had notice. He found, however, that since the accounting showed Gaulden indebted to Abbott for $471.66 and Abbott indebted to Mizner Land Corporation in a very large amount, and Abbott and Gaulden jointly and severally indebted to Searles in the sum of $9,000.00, that Searles should be paid $9,000.00, and Mizner Land Corporation $471.66, and Gaulden the balance, or $9,378.34, of the impounded fund.

Exceptions were filed to the Master's report and on final hearing upon pleadings, testimony, and the issues so made, the chancellor found and decreed Gaulden to be entitled to

recover the whole of the impounded fund, that Abbott have and recover from Gaulden $471.66, that Mavic Corporation have and recover from Abbott $13,644.38 entrusted to him and for which he failed to account, that Mizner Land Corporation have and recover from Abbott $55,291.02 entrusted to him and for which he failed to account, that Searles have and recover from Abbott $5,000.00 being the amount of a loan made to Abbott by Searles, and that Gaulden have and recover from Abbott and Searles jointly $200.92. The exceptions to the Master's report were overruled except when not in accord with the final decree so summarized. The final decree was subsequently amended to allow Special Master Caldwell a fee of $350 and Special Master Shields a fee of $1000.00. Petition for Rehearing was denied.

From the final decree in the consolidated cause, complainants appealed and Abbott filed cross assignments of error. Josephine Abbott, wife of C. D. Abbott, also filed cross assignments of error.

Counsel for appellants, cross appellants, and appellees, have filed illuminating briefs in support of the questions raised. They do not agree as to correct statement of the questions involved or their treatment. The record is considerably more than two thousand pages and most of the material questions grow out of the items of account numbered two, three, and five, in relation to which the chancellor sustained exceptions to the Master's report and entered his judgment accordingly. We have at great labor reviewed the record and will first treat what we conceive these questions to be.

With reference to account No. 2, the Master found that between May 22, and December 1, 1929, Searles entrusted to Abbott and Gaulden, through Abbott, a total of $100,-476.13, and allowed proper disbursements therefrom of $91,476.13, leaving a balance of $9000 due by Abbott and

Gaulden to Searles for which they should be required to account. The chancellor took the view that the evidence proved payment of the $9000 to Searles by Abbott and sustained exceptions to the Master's finding.

The real difference between the Master and the Chancellor was in the degree of proof required, the Master holding that the burden was on Abbott to show conclusively that he paid Searles the $9000, while the Chancellor ruled in effect that such fact could be supported by the preponderance of the evidence rule. The burden was on Abbott to prove by competent evidence that he paid the $9000.

The evidence shows that Searles did not positively deny receiving the money but stated that he did not believe he received it because his "day slips" did not show that he did. The evidence of Searles was vascillating and indefinite and he positively denied getting other items which the evidence proved conclusively that he did get. The testimony of Abbott as to payment of some of the items is corroborated by the evidence of the witness, Lefebvfe, it was shown that Searles was continually making demands on Abbott for funds and the ledger account with contemporaneous entries kept by Abbott and Gaulden checked accurately with the account of small items by which Gaulden claims to have paid the $9,000.00 and was proved by them. It was further shown that one check for $3,000.00 dated August 31, 1929, bore the notation, "Cash V.A.S." Other conclusions which may reasonably be drawn from the evidence support the Chancellor's finding. He knew the *locus in quo,* was familiar with the parties, and the evidence as a whole strongly preponderates in support of his conclusion. Since the Master and Chancellor applied a different rule of proof and there is ample evidence in the record, if believed, to support the Chancellor's finding; we feel impelled to let it stand on this point.

As to account No. 3, the Master found that Mavic Corporation entrusted $65,000.00 to Abbott, who made proper disbursement of $47,760.90 of said amount and that there was still due Mavic Corporation a balance of $17,239.10 which Abbott alone should be required to account for. The Chancellor approved the Master's finding except as to the amount that should be accounted for, that he adjudged to be $13,644.38.

The record discloses that Abbott was president of Mavic Corporation, that the $65,000 was a mortgage loan secured by the latter from Edward Moore, and that it was deposited in the name of and by order of the corporation to the credit of Abbott as president and expenditures were made from it by order of the corporation, Searles being the principal stockholder.

This fund was received by Abbott some time before the firm of Abbott and Gaulden was dissolved but after Searles had requested that Gaulden have nothing further to do with his business. Appellant contends that Gaulden should be held to account with Abbott because their firm drew the deed and mortgages, and performed other services in connection with the loan. This is all true but Gaulden nor the firm of Abbott and Gaulden had anything whatever to do with handling or disbursing any of the funds. Searles controlled the Mavic Corporation and he turned the loan over to Abbott as president of the corporation, which gave him *carte blanche* to spend it in the interest of the corporation and both the Master and the Chancellor found that he did so except as to the amount for which he was required to account. We find no basis for reversing them on this point. The firm of Abbott and Gaulden had no control over the fund and had nothing to do with its expenditure.

The difference between the findings of the Master and the Chancellor as to the amount that should be accounted

for was a question of interpreting the evidence. The Chancellor gave Abbott credit for a check for $3,594.72 which the Master apparently did not follow. This was the actual difference between the amounts allowed and since there is evidence which supports the Chancellor's finding that this check was disbursed for Searles, and no showing in the Master's report to the contrary, the Chancellor's decree is affirmed on this point.

The next question arises out of the distribution of the proceeds of the sale of the Mizner mile. The Master found that all the proceeds of said sale were properly distributed except $73,291.02 and that Abbott should be required to account for that amount to Mizner Land Corporation. He held that Gaulden should not be required to account for any part of the proceeds of this sale for the reason that they were received by Abbott long after the dissolution of their partnership. The Chancellor approved the Master's finding except as to the amount Abbott should be required to account for which he adjudged to be $55,291.02.

In our view the Master and the Chancellor were both in error on this point. The Mizner mile was sold for $650,000 cash. When it was placed in the hands of Abbott as trustee for management and sale, Searles agreed to pay him a trustee's fee of ten per cent of the sales price-if sold by him. When the sale was made, Abbott had been serving Searles as his personal counsel for approximately three years under a contract that required all his time and a compensation equal to what he had been earning in the general practise which was agreed to be more than $40,000 per year. When the Mizner mile was sold, Searles was due Abbott compensation for about three years' services as counsel in addition to his trustee's fee of $65,000 for making the sale. Abbott insisted on settlement in full but Searles complained about the amount of the compensation claimed. Negotiations fol-

lowed which resulted in a written contract whereby Searles agreed to pay Abbott a fee of $135,000 in lieu of the trustee's fee for selling Mizner mile and all other claims held by Abbott against him at that time.

The Master held this contract void on the theory that the minds of the parties did not meet and allowed Abbott a fee of $65,000 on the basis of *quantum meruit* for all services due him by Searles. The Chancellor held the fee contract good but he held that Searles had a right to rescind it at any time which had been done so he fixed Abbott's fee on the basis of *quantum meruit* at $80,000 for all services due him by Searles, including the trustee's fee for selling the Mizner mile.

The Master and the Chancellor both found that the proof failed completely to sustain the charges of fraud, deceit, and over-reaching charged by Searles against Abbott and Gaulden. It is shown that Searles discussed the fee contract frequently with Abbott before it was executed, knew its contents, made interlineations in it, and testified that he considered it a bargain. He gave Abbott a draft for the full amount promised and ordered the Atlantic Title Company to pay it. Under this state of facts, we find no basis in law or equity for refusal to recognize the fee contract or to remake, alter, or amend it.

It is perfectly apparent why the conscience of a Chancellor in this state would collapse under the burden of allowing a fee of $135,000; it is difficult for a member of this Court to think in such terms, and in fact it throws the economic conscience of the writer of this opinion into spasms to contemplate such munificence, but the parties were *sui juris,* they dealt at arm's length, both knew the contents of the contract, neither imposed on the other, and there was ample consideration shown for it. This Court has repeatedly en-

forced such contracts.  Bolles v. O'Brien, 63 Fla. 342, 59 So. 133; Pilkington v. Rose, 88 Fla. 547, 102 So. 751.

It is quite true that as a whole the terms of the contract are not as definite as they might be and in some respects it is susceptible of more than one interpretation but taken in connection with the evidence there is no doubt that the fee of $135,000 was understood and agreed on and that at the time Searles was pleased with it.  It was never formally rescinded.  Abbott was in the employ of Searles at the time he filed his bill in this cause.  There was a failure to prove deception or fraud and the fee agreed on was $50,000 below that Searles was under contract to pay at the time. It may be admitted that the fee was ample or even excessive but that is no ground for the Court to reduce it if the parties, as here, contracted in good faith to pay it and knew what they were doing.

But under the facts of this case, this Court is not in a position to say that the fee contracted for was excessive. The record discloses that Searles was well past middle life when he inherited his fortune.  He had never had anything more than a meager living and was without business experience or inclination.  When he induced Abbott to give up his practise and devote his entire time to his (Searles) business, he considered Mizner Mile to be worth one and one-half million dollars, he had possessed himself of four corporations that were involved in litigation and other complications, he had taken a plunge into high society and was supporting four establishments on which he was wasting his substance, he had also acquired a young wife who was suing him for divorce.  There was a suit for libel pending against him.  John Wanamaker was suing him for a store account of $5,000.  A woman was suing him in New Jersey, and he had instructed Abbott to defend another woman who was under indictment in the Federal Court in Florida

for selling liquor. He had suits pending in Palm Beach County to cancel tax assessments. He was having trouble with his former trustee, and there was a suit pending against him in New York involving attorney's fees in the matter of the settlement of his inheritance. He was involved in other personal and legal complications. If this was not a provocation sufficient to demand the full time of a good lawyer, it would be difficult to imagine a situation that would.

Summarized, the record presents a pathetic picture of the modern prodigal wasting his substance. Like the run of the mine man who evolves abruptly from "shine" to champagne by means that he had no part in creating, he settled in a far country and commenced to celebrate. His companions gathered about him eager to do him obeisance. He was eager to impress them with his great wealth and they were as eager to help separate him from it. While the revelry was on, thinking in modest terms was cast to the discard. When his substance was dissipated. he cried to the Courts to aid him. His cry can avail him little against a showing that he wasted voluntarily, no one deceived him or practised fraud on him and he does not plead idiocy.

It is next contended that Gaulden cannot maintain equity suit No. 9000 because he breached the partnership dissolution agreement entered into between him and Abbott.

In the dissolution agreement it was provided as a condition thereto that when Abbott collected his trustee's fee for selling Mizner mile he would convey twenty-nine per cent of the net amount so collected to Gaulden. It was further agreed by Gaulden that he would assume responsibility for and would pay certain sums due by the firm of Abbott and Gaulden to designated law book publishers. The Master and the Chancellor found these sums to aggregate $471.66.

Gaulden refused to comply with his part of the latter agreement for which Abbott contends that he is now barred from recovering any part of the trustee's fee. It is true that if a party to an executory contract with mutually dependent covenants fails to comply with his covenants the second party may refuse to perform but the contract in question, being composed of independent covenants, is not of that class.

Gaulden is accordingly entitled to recover from Abbott twenty-nine per cent of the "net sum received" by him (Abbott) as his trustee's fee for selling Mizner mile. From such sum Abbott should have deducted before payment any legitimate expense he was put to in making the sale, including the $471.66 the Master and Chancellor both found to be due Abbott by Gaulden on the law book account. Abbott's income tax is ordinarily not a part of the legitimate expense of making the sale of Mizner mile.

But appellant, Searles, contends that even if Gaulden is permitted to recover from Abbott under the contract stated he cannot satisfy his claim from the impounded fund because he (Searles) has a superior claim on that.

He bases this contention on the fact that the impounded fund was a trust fund in the hands of Abbott, being a part of the proceeds of the Mizner mile, that Abbott's contract with Gaulden was made four months before the sale of Mizner mile and that it was made three years before Abbott actually accounted to his *cestui que* trust, that Gaulden could under no circumstances become entitled to the proceeds of this trust until Abbott made accounting in full to Mizner Land Corporation, and not having done this his assignment to Gaulden was null and void and passed no title to any part of the trust fund to him. To support this contention appellant relies on Belknap v. Belknap, 5 Allen (Mass) 468; In re. Furness, 7 Fed. Supp. 844; Colonial

Bank v. Sutton, 139 N. Y. S. 1002, 79 Misc. Rep. 244; and Fischer v. Liberty Nat. Bank & Trust Co., 61 Fed. (2d) 757.

The Master and the Chancellor both found that the impounded fund was part of the proceeds of the sale of the Mizner mile. They both impressed an equitable lien on it in favor of Gaulden on the theory that Abbott promised to convey it to him when earned, that the contract attached and Abbott became the trustee of Gaulden from that moment to hold and pay the fee when earned, and that Abbott received his fee before this suit was filed and the fund impounded. Barnes v. Alexander, 232 U. S. 117, 34 Sup. Ct. 276, 58 L. Ed. 530; Jones v. Carpenter, 90 Fla. 407, 106 So. 127; In re. Interborough Consol. Corp., 288 Fed. 334; Broom v. Bisbee, 14 Fla. 21; are relied on to support the Chancellor's conclusion.

There can be no doubt about the correctness of appellant's contention in a pure trusteeship where the *cestui que* trust has created no intervening equities in favor of third parties as was done in favor of Gaulden in this case. When Searles and Abbott made the $135,000 fee contract, Abbott as part of the consideration released his $65,000 trustee's fee which he would have been entitled to for the sale of Mizner mile and on which Gaulden held his claim. Searles directed Atlantic Title Company, which disbursed the proceeds of Mizner mile, to pay Abbott his $135,000. It was paid promptly and Abbott deposited it in West Palm Beach Atlantic National Bank in his wife's name. On the strength of Gaulden's claim on the $55,000 trustee's fee for which the $135,000 fee was substituted, he attached the funds in the bank in the name of Abbott's wife and the proceeds of the attachment are the impounded fund.

Gaulden's attachment also impounded over $20,000 more than the impounded fund in question which was ample to

replace all funds shown by the accounting to be due from Abbott Searles yet he (Searles) participated in the release of said funds from the attachment and refused to assist Gaulden in holding them for the satisfaction of claims shown to be due.

Searles decided to cancel his contract with Abbott long after he paid the $135,000 and long after Gaulden attached his part of it. In view of such a state of facts we think in equity that barring the execptions noted, the claim of Gaulden in the impounded fund is superior to that of Searles.

Other questions argued have been considered but in the state of the record we deem it unnecessary to discuss them. The judgment of the Chancellor is accordingly affirmed in part and reversed in part.

Affirmed in part, reversed in part.

WHITFIELD, BROWN, BUFORD and DAVIS, J. J., concur.

ELLIS, C. J., not participating.

### ON PETITION FOR REHEARING

On petition for rehearing, this cause was again reargued on the merits and additional briefs were filed. The record and the briefs have been re-examined in the light of the late argument and we find no reason to change or modify what we said in our former opinion.

Counsel for L. S. Gaulden insisted on rehearing that some features of the main opinion should be clarified. On this point, we deem it sufficient to say that while we did not discuss all the items in the Chancellor's finding, his judgment was in all respects affirmed where it was not in terms reversed. It was in fact affirmed as to all items except the distribution of the proceeds of the "Mizner Mile," being item four, and the reversal as to this item went only to the amount of the fee allowed.

In reference to any expenses allowed Abbott for making the sale of Mizner Mile, we are confirmed in the view that the contract for the sale provides for the usual expenses incident to making such sales. Unless Abbott in some way actually paid income taxes on the fund awarded to Gaulden, certainly he cannot be allowed any deduction for that. If he was put to any regular and legitimate expense in making the sale that he had not been compensated for, he may make proof of same to the chancellor and have allowance made therefor if claim was regularly made for it. If claim was not made in the court below, it will be considered as waived.

Reaffirmed on rehearing.

ELLIS, C. J., and TERRELL, BROWN and BUFORD, J. J., concur.